Good morning, Your Honors. May it please the Court, I'd like to reserve four minutes for rebuttal. Can you just keep an eye on your time? David B. Owens with Elizabeth Wong. We represent Betty Browning, Paul Browning's mother, who is now in her 90s and has spent nearly 40 years seeking justice for her son's wrongful conviction. As this Court described it, Browning's conviction was an extreme malfunction of the Las Vegas Police Department officers failed to disclose powerful evidence of Browning's innocence, including that the victim, Hugo Ellison, saw the perpetrator and described him in a manner that could not have been Browning, and that the perpetrator left shoe prints at the crime scene, which also could not have belonged to Browning, and that were not left by first responders. They suppressed it anyway. Consistent with this Court's prior decision, finding a Brady violation on a much higher standard, on a standard deferential to state courts and against Browning, a reasonable jury in this case can find Browning's same rights were violated on a much lower standard where deference must be paid to the facts and they must be construed in Browning's favor. So respectfully, on those grounds, because the trial court here entered summary judgment in a manner that misconstrued the facts, applied the wrong legal standards, and violated basic principles of civil procedure, reversal is respectfully warranted. I wanted to start with some of the factual errors, because at summary judgment, this is an issue that we often encounter, where the factual record is not construed properly in favor of the non-movement, and that's an issue that happened here. The exculpatory hair, the source of the statements about the perpetrator's hair came directly from the victim of this tragic crime, Hugo Ellison himself, and that was shoulder length, that it was loosely curled, and it was wet. Right, so when, I guess it was Officer Brannon's police report sort of summarized that as jerry-curled type hair rather than using the exact words that Mr. Ellison had given him, what is the evidence that the distinction between the exact wording that Ellison used and Brannon's summary, what is the evidence, you know, at trial that distinction proved to be important? But what is the evidence that Brannon should have been aware that that distinction would become important? Yes, Judge. So I think that the Court's right, which is this Court previously held the exact words matter in the context of this particular trial, because the materiality inquiry focuses on what the dispute was at the time. I think that the obligation that Brannon had to disclose the exact words are the exact reason why Brannon engaged in meticulous questioning, because officers know that they have to disclose information that comes from, you know, this is the most important possible witness that you could have. It is the victim of a crime, and that descriptions are necessary. And it was clearly established in 1985 and long before it that officers had an obligation to disclose all material information about somebody's guilt or innocence. I can't think of a more quintessential thing when you're interviewing a witness moments after the crime, sort of this is why the Court acknowledges, like, sort of dying declarations, excited utterances. Those crucial details are exceptionally important, and preserving them and documenting them matters. And there's another thing here, which is also, Brannon's report comes after the fact, right? He writes it up, he types it up, and he knows, you know, it's not like the next minute that there's, that Browning is just automatically convicted. This dispute does come up, and Brannon sits there and says nothing. And there's other reports that are generated in the case that sort of obscure this issue about a jerry curl or something like that, that enable this to continue. So, for example, Defendant Leonard wrote in a saying, Browning has a jerry curl. Oh, that's not true, one. And two, the fact that Brannon sort of misdescribed what Hugo Elson told him directly enables that to further the prosecution wrongfully against Browning as well. And so when you said just a moment ago that Brannon sat there and said nothing, was he in fact present for the part of the trial where that issue was discussed? He was called at trial, and he was questioned about his interactions with Mr. Elson. He did not at that time disclose this, the fact that the description itself came from Hugo Elson and that it included the exact terms that, about the hair itself. So he was questioned about it. Now, obviously, witnesses get on the stand and ask questions, or answer the questions that they're asked, right? And so I don't know that I'm, I'm not arguing that Brannon had some obligation to blurt that out at some point, but part of this court's prior determination that there was no Napieu violation that can be imputed to the prosecutor was because the prosecutor didn't know that Brannon had this exculpatory information. This is why the Brady duty applies to police officers, because even a prosecutor operating in good faith, even a prosecutor who's trying to put on a case, and this is a capital case in which an innocent person spent over three decades on death row, that they still have to rely on the police to disclose exculpatory information. So it was an issue at trial, and I think this is a quintessential type of thing. I think that the court's question, Judge Miller, your questions may go to an issue about what was Brannon's mens rea at the time, because, you know, it's required, you know, the Supreme Court has said that negligence is insufficient to amount to a constitutional violation. Tennyson says we have to prove deliberate indifference or recklessness, right? Brannon himself was like, I'm surprised that Mr. Browning was arrested. So the fact that he, after learning that he was surprised, you know, because he's the one with this crucial information, could have said it's impossible. I saw Browning. I saw his afro. We have the pictures in the record, and it couldn't have been him. There's no way that could have been him. He could have said it then, despite whatever he put into his report. Once he learned that Browning had been arrested and he was surprised, and his — that goes to his mental state. Now, obviously, at summary judgment, mental state is not, you know, usually the type of thing that summary judgment should be granted on here. And so I think that there is evidence in the record that would permit a reasonable jury to find that Brannon himself had the requisite mental state, and we accept that that's a mental state that we have to prove. And part of the reason that that includes the other officers has to do with their joint investigation and is implicated by the other exculpatory information here, which includes the shoe prints from the crime scene. And I want to just emphasize something that I feel like I maybe failed on with my briefing, so I apologize, which is Horne's report itself describes the shoe prints going from Mr. Elson's body to the door. That's in his report itself. And so there's not a question about whether or not the shoe prints were going to the door or were leading out or, like, could be evidence of an escape. And the issue, the Brady issue, is that Horne knew that those had likely to be made by the perpetrator. And he was asked questions at the trial, well, could it have been the paramedics or something like that? The answer is no. The insinuation is no. So at trial, they were able to create an issue as if there was a dispute there. And if you add these things together, and this is where the trial court's materiality analysis really fails, because there's no sense of the cumulative effect of this evidence. And, you know, Kyle's and other Supreme Court cases tell us you have to consider materiality cumulatively rather than piece by piece. The Supreme Court said it again recently in Glossip. It's in Weary against Kane. Materiality is cumulative. If you consider the shoe prints and you consider the hair evidence, a reasonable jury can easily find here, as this Court previously did on a much higher standard, that Mr. Browning's constitutional rights were violated. I wanted to address very briefly one of the, I think, that the key arguments that's sort of lingering, and I think problematically with the defendant's position in this case, as accepted by the district court, which is that because some of these things came up at trial, there couldn't have been a Brady violation. I think this gets the law exactly backwards. The Brady violation enabled some of these disputes to occur at trial. Had Brannon disclosed that the hair description came from Ellison and was not a characterization but was very specific, the dispute wouldn't have happened at trial. Had Horn disclosed that the bloody shoe prints were there when he arrived and not after paramedics arrived, that dispute wouldn't have happened at trial. And this goes to a core issue, because this is a funny case. The facts here are bonkers. It's implausible to us that Mr. Browning did all of these things and went to the Wolfs and spontaneously confessed, asked them to ditch a knife, put all the stuff in their room, all of these types of things. And so I think it could be hard to say, well, wasn't there at least probable cause? He's in the room. He knows these people. And this goes to our Fourth Amendment claim. And this is, I think, the really critical thing about construing the facts properly at this juncture, is that the only way that you get to their probable cause, the idea that Browning killed Ellison, is by also ignoring the Brady violation, because it's only moments later. And Brannon knows it cannot be Browning. The victim just told him. It's a guy who had shoulder length, loosely curled, wet hair. That is absolutely not Browning. So when they know that information, juxtapose that against what the Wolfs are saying. To them, no reasonable officer, and we did submit expert evidence on this issue, would find that, you know, to implicate him in the crime. I've got a few minutes left, and I'd like to reserve it. Thank you. Mr. Anderson. Thank you. May it please the Court. Craig Anderson, on behalf of the defendants. Starting with the hair evidence, since that was primarily talked about, Officer Brannon did his duty. He his report is clear that he talked to three individuals. He talked to Josie Ellison, he talked to Debra Coe, and he talked to the dying Hugo Wilson, and obtained what he said was a fairly complete description as to what the individual looked like. He then used his interpretation of what Hugo had told him to say that the hair resembled a Jerry-style hairstyle, which of course did not match Browning. He broadcast that over the air. So he didn't just sit by. That was what he broadcast. He did not hide this information. Anyone reading the report would know, or should know, that that information came from Hugo, because Josie said that she could not identify the person, and later testified at trial that what she saw of the assailant was a bushy hair poking out from underneath a blue cap, which is another issue, is everyone agrees that the assailant or the suspect was wearing a blue cap. So most of his hair was concealed. Debra Coe, who saw an individual run by, also described an afro-style haircut, bushing out from beneath. So the only person that could have provided the Jerry Curl-style information was Hugo Wilson. And when you get into the Brady realm, officers are not required to do perfect reports. And in fact, recently in the O'Done case, the court noted that reports are drafted. You don't really know what's material when you're drafting them. You're doing the best you can with the information that you have at the time, and then later things may come out to be different or what you thought was important was not and what you needed was. So here, Officer Brannon did not violate Brady by including the information of a hairstyle that did not match Browning. However, other witnesses said, identified a hairstyle that did match Browning. We all know the inherent unreliability of eyewitnesses. We know that Mr. Elson was dying at the time he gave his description. And so it's not a Brady violation. He didn't suppress the evidence of the hairstyle. But what happened? I mean, that's fine as far as it goes. But then when you get to the trial and, you know, the fact that the hairstyle doesn't match, you know, becomes an issue, and the suggestion is made that maybe the reason for the mismatch is that Mr. Elson was just confused about what a Jerry Curl is, then the distinction between, you know, the actual physical description, you know, shoulder length and what, and the phrase Jerry Curl becomes important. And doesn't the officer at that point have some duty to disclose, like, you know, actually those words are, the words are not the words that Elson used. The words are my description of what he used. I would say he has that duty if he's asked the question. You know, witnesses at trial are stuck with the questions they're asked. Well, yes, in the sense that he can't, you know, stand up in the courtroom and volunteer the information, but he can tell the prosecutor about it. Doesn't he have a duty to do that? I would say that he does and he did, because it, like I said, if you look at the report, there's only one source for that information. He talked to three people, and two people identified an afro. One person, Hugo, is the one unaccounted for, so it had to have come from him. So anyone, what the Brady requires is that the detective or the officer provide essential facts, enough facts so that you know there's an issue here or that something needs to be explored further, because when they're doing these reports, he doesn't know. Wait, wait. I'm sorry. Is it, your view is that Brady requires only the disclosure of enough to alert the defendant that he needs to explore something further? I thought if there's material exculpatory evidence, that evidence has to be disclosed, doesn't it? Yes, there is, and I agree with you. I probably didn't say it artfully, but, you know, the cases say that if you look at what the defense and the prosecutors had, and the case I'm thinking of is Raley, R-A-L-E-Y versus Yist, which the pertinent question is whether the accused has enough information to be able to ascertain that information on his own. And so here, someone looking at this report would be, where did this jerry curl information come from? And Browning should have been asked that, or, sorry, Officer Brannon should have been asked that at trial. He could have been asked by the criminal defense attorney. He could have been asked by the prosecutor. But he is limited to answering what they ask him. And so he, like Mr., my friend Mr. Owen said, you can't just blurt out something. And I don't even, because the officers don't sit through the trial, they may not even know the significance of the information. Because Officer Browning, keep confusing the Bs, Officer Brannon was the officer he arrived and he protected the scene. Okay? He's not a detective. He's not really investigating the homicide. His job was to show up, to get information he could that was immediately available to him, make sure Mr. Elson received medical care, and then protect the scene until the detectives come who have experience and training to determine what the relevant and most important information is. And so by putting it in his report that there was differing hairstyles reported by the witnesses, everyone knew that, that there were different hairstyles, that would put the prosecutor and the defense on notice that there is an issue that needs to be further explored in this, in the criminal trial. Does that answer your question? Well, I mean, I guess it invites the next question, which is, I mean, we're here on summary judgment, right? And all of that is, I think everything you just said is evidence from which a jury could infer that he didn't have deliberate indifference or didn't act with deliberate indifference because he didn't have the requisite knowledge of the materiality of this piece of evidence. But isn't there, I guess the question is, isn't there evidence in the record from which a jury could reach a contrary conclusion? Well, you're looking, so the standard, of course, is deliberate indifference or reckless indifference. And here, what the officer's obligation was, was to document all evidence they thought was pertinent or could become pertinent, which is what Officer Brannon did. Now, there could have been follow-up following that. That happens all the time. Officers have to elaborate on reports. They get asked questions. He submitted his report, and unless he is informed, hey, there's more information needed, he has no reason to know that that has become more material. And he didn't suppress the information. The information was available and was actually, you know, known to everyone throughout the trial. And so I think that if you get to, so when you look at deliberate indifference and reckless disregard, the Mellon case was where the officer didn't tell the prosecutor or the defense that a fellow officer had reported that the only witness implicating someone in a crime was a liar. And that was the only evidence upon which the Mellon suspect was convicted on. So that information was withheld where it was the crux of the case. And similar in, I believe, Tennyson is where the officer's deliberate indifference and the reckless disregard was shown because the officers there, they were upset that different officers got a confession. And as they said, it peeled them, and so they didn't look further into that information because of a personal grudge. So there does have to be some evidence that there was reckless disregard or deliberate indifference on Officer Brandon's part, which there is not in this case. He obviously could have drafted a more clear report. He could have provided more information. But he didn't suppress anything, and there's no evidence in this case that he was reckless with that information or that he was deliberately indifferent. He believed that he had provided the information necessary to put the prosecution and the defense on notice. And what about the, your friend on the other side mentioned Brown's statement that he was surprised when Browning was arrested. And one inference from that would be that knowing what he, in fact, knew about the description that had been given to Middleton, like he knew that it couldn't be him, isn't that evidence from which a jury could infer that, you know, he was on notice, that he should have, that the information that he hadn't yet provided was going to be relevant and that he should provide it? Well, that information had already been provided because when he saw Mr. Browning Well, but I guess I mean the specific information about, like, the specific information that it seems like he never provided is who used the phrase Jerry Curl? Because that's, I mean, that's what allowed, you know, the criminal jury to discount what otherwise would have been a very powerful description from Elson, right? And that's the piece of information that never, never got shared. So what Officer Brannon said that Mr. Elson told him, or I think he was indicated to him, was that the hair was shoulder-length, it was wet, it was glossy, which, of course, is not consistent with an afro. Officer Brannon, who, you know, is African-American, interpreted that to be he had a Jerry Curl-style hair. So he did the — that would be a distinction without a difference because if he had testified that, oh, he said it was wet, glossy, shoulder-length, it would have had the same impact of saying Jerry Curl. Well, but as I understood the criminal trial record, and you'll correct me if I'm wrong, that the reason it's not the same is that if you think that what Elson said was wet, shoulder-length, et cetera, then that's contrary to it being an afro. If you think that what he said is a Jerry Curl, that is also contrary to being an afro, but can be explained away if you think that Elson was just confused about what a Jerry — and didn't really know what a Jerry Curl was. So like one way, it's, you know, powerful exculpatory evidence. The other way, it's maybe not. And so the distinction seems like it makes a big difference. So the — what I'm saying is that what was relayed to Officer Brannan was a hairstyle inconsistent with Browning once he was arrested. And that hairstyle was what was broadcast, is what was in the reports. So anyone involved in the case would know that there is a problem, at least something for the defense to grab on to, that at least one witness did not describe the same hairstyle. And then it would be easy to figure out that that witness was Hugo Elson by just looking at who provided the information. And so that would be the exculpatory evidence, is we have a witness that is seeing a hairstyle that does not match the individual eventually arrested. And then — and that was explored at trial. They called an expert witness on hairstyles, the defense did, who talked about how the hairstyles didn't match, and the jury made their determination on that. I'm not sure if I'm answering this.  Okay. Okay. Moving on to the footprints, since they were touched upon, the bloody shoe prints is an interesting one, because what Officer Brannon said at the 1999 evidentiary hearing was that when he arrived, there were footprints near the body, which would not be a controversial statement, considering that we know that Josie and Deborah Coe rendered aid to Mr. Elson, were stepping around in the blood and present there. He never said he saw the shoe prints going away from the body. His only statement was, I saw footprints near the body. When CSI Horn got there, the paramedics had already taken Mr. Elson from the scene. And so he then saw, photographed, documented the footprints that were leading away from the body and determined they did not belong to Browning. But where it's gone astray is that Brannon is being imputed to have seen the footprints walking away from the body, which is not the case. His testimony was, I saw footprints near the body when I arrived. And when he testified in his deposition 30, 40 years later, he said, I don't remember the footprints away. I remember footprints near the body. And so when we get to the footprints, Horn would not have known that those footprints were there because no one said they were there. No one saw them prior to the paramedics arriving. And then they stopped at the sidewalk right when they got out, where the person would have been loaded on a gurney. So that is not evidence that was suppressed. As the footprints were documented, they were photographed, and Mr. Browning's criminal defense attorney appreciated that evidence and used it to his advantage at the criminal trial and said he preferred that it was not explored. He purposely left it open so that he could argue that the footprints were perhaps left by the real killer. So there's no evidence of suppression of the footprint evidence. And then the third piece that the plaintiffs bring up is the credibility of the Wolfs, that Officer Radcliffe somehow lied in his report where he said that the Wolfs were reliable informants, where what he said was that the Wolfs had been informants for five and a half years. He mentioned that Vanessa Wolf was a prostitute. Clearly, they were people of some sort of criminal background. And just mentioned, all he mentioned was they've given him reliable information for the past five years, which has not been shown to be untrue, that the Wolfs provided information. And then the Wolfs' criminal histories and their backgrounds were explored extensively at trial. It was brought out that they built people out of money, that they stole, that they kept some of the jewelry. So there was never any buttressing of their reputations or any attempt by the defendants to somehow make the Wolfs seem more credible than they were. They were simply informants. They gave information, which happens a lot in criminal cases. You don't always have the best witnesses who identify suspects or who tell on other people for crimes. And so he documented everything just as he was supposed to do. I have 18 seconds if anyone has any questions.  It appears not. Thank you very much. Thank you. Rebuttal? I think, Your Honors, and very briefly, I think that the defendant's presentation here confirms that they're asking this Court to operate on the wrong legal standard. This is summary judgment. The question is whether a reasonable jury construing the evidence in the favor and the light most favorable to the nonmovement can find that the officers violated Mr. Browning's constitutional rights. The answer to that question should be yes. And the type of arguments that we're hearing here are, were they required to? Do they have to? And that made it into the district court's analysis. A fair-minded jury could reject the argument. Well, sure. That's why we have jury trials, is to argue these things out and let the jury decide. It was not for a judge to adjudicate those things by construing the record in a manner most favorable to them. There is a legal error here as well. Mellon against Winn, Carricker against Stewart, the United States Supreme Court's case, Banks against Dredke, says you can't play hide-and-seek with the evidence. The government has an affirmative obligation to disclose favorable exculpatory information. And what they are really saying is, meh, this was close enough. You should have found it. You should play a little bit of hide-and-seek. The criminal defense attorney should have asked more questions or had a different strategy. But that argument is foreclosed as well by this court's precedent in Amando against Gonzalez. The state's Brady obligation isn't exclused by giving somebody a little bit and saying, go work harder, defense attorney. That's not what the law is. And I think that the act of suppression is a little bit confused here as well, which is that it was never, ever disclosed until 1999 that it was Hugo Ellison himself who gave the description of the perpetrator's hair and that that description itself was that it was shoulder-length, loosely curled and wet. And this court previously understood that the exact words matter. And we know from, from, sorry, let me put this a different way, which is that the report itself, Mr. Brannan's report, I find it to be confusing, but it doesn't matter. Those things were first disclosed by Brannan in 1999. That's the suppression. And as counsel mentioned, it was Brannan's interpretation. An interpretive gloss is not the same thing as an actual description. And I, I'm glad that counsel mentioned Mellon because another part of Mellon is about the types of evidence that goes to an officer's mental state with respect to finding something negligent as opposed to reckless or deliberate indifference. And the evidence here, and we can use obviously direct and circumstantial evidence, Brannan doesn't have to come in and say, I was reckless. Instead, we can look at things, circumstantial evidence, like his own surprise at Mr. Browning's being arrested, but also evidence of police practices. Was he, was what he did deviating from established practices that existed in 1985? Here, we submitted expert police practices, expert testimony about this, that failing to provide the actual description and instead providing an interpretive gloss would have been a departure from accepted standards at the time. And so what Mellon talks about is the need, is how that can be circumstantial evidence of a state of mind. Properly construed, the record demonstrates that a reasonable jury could find that Mr. — excuse me, find in our favor. Two things, two final things very briefly. One about the shoe prints, which is that I think that the, the argument essentially comes down to trying to parse the record in a manner that doesn't accept any inferences in favor of the plaintiff. A reasonable jury could look at all of the evidence here, again, which does include our expert testimony, and find that it was suppressed. And finally, with the wolves, there is additional circumstantial evidence of their lack of credibility. Not only is their story farcical, but there's no — they were never treated as suspects, and there's additional evidence from our police practices experts that would show that. So respectfully, Your Honors, we would ask that you reverse the determination of the district court granting summary judgment on all accounts which was, we believe, was erroneous. Thank you very much. We thank both counsel for their arguments, and the case is submitted.
judges: SCHROEDER, THOMAS, MILLER